IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 4, 2025

## JIMMIE MARTIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 07-07973      Carlyn L. Addison, Judge
_____

### No. W2024-01303-CCA-R3-PC
_____

A Shelby County jury convicted the Petitioner, Jimmie Martin, of second degree murder of Martha J. Bownes, and the trial court sentenced him to serve twenty years. On appeal, this court affirmed the judgment. *State v. Martin*, No. W2013-00889-CCA-R3-CD, 2014 WL 2566490, at *1 (Tenn. Crim. App. June 5, 2014), *no perm. app. filed.* The Petitioner filed a petition for post-conviction relief, claiming that he had received the ineffective assistance of counsel at trial. After a hearing, the post-conviction court denied relief. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel because his attorney had a conflict of interest at the time he represented the Petitioner and because Counsel failed to call an eye witness, Christopher Martin, to testify at his trial. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

John P. McNeil, Memphis, Tennessee, for the appellant, Jimmie Martin.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Monica Timmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Shelby County jury convicted the Petitioner of the second degree murder of his girlfriend, Martha J. Bownes ("the victim"), and the trial court imposed a twenty-year sentence. After the trial court denied the Petitioner's motion for a new trial, the Petitioner appealed, asserting that the evidence was insufficient to sustain his conviction and that the

trial court allowed impermissible testimony. On direct appeal, this court concluded that the trial court erred by admitting the victim statements as excited utterances but that the error was harmless. This court affirmed the trial court's judgment. *Martin*, 2014 WL 2566490, at *1.

This court summarized the facts presented at trial as follows:

James Bownes, the victim's father, testified that the victim served in the military and spent time in Iraq. When she returned to the United States, she began dating the [Petitioner], and they moved into an apartment in Memphis. One Sunday in January 2007, Bownes received a message from the Memphis Police Department (MPD) Homicide Office. Based on the message, Bownes and his wife drove to Memphis and learned the victim was dead.

. . . .

Tamu Leland, the victim's sister, testified that she and the victim grew up in Batesville, Mississippi. The victim began dating the [Petitioner] after she left the military. One day in April 2006, a friend of the victim telephoned Leland's father, James Bownes. Based on the call, Bownes and Leland went to Memphis, where the victim was living with the [Petitioner], to check on the victim. When they arrived at the victim's apartment complex, the victim was standing outside with two police officers. Leland said that the victim was leaning against a pole, that the victim was "flush red looking" and "shaky," and that she went to console the victim. Leland saw that the driver's side window of the victim's car had been shattered, and the victim told Leland that the [Petitioner] broke the window when he tried to hit her with a hammer. The victim wanted Bownes and Leland to take her home to Mississippi, and the victim rode back to Batesville with them. During the drive, Leland picked glass out of the victim's hair and saw that the victim had a scratch on her arm and a scratch on her chest. The victim stayed with Leland in Batesville for about one week. Leland said that the [Petitioner] kept telephoning the victim and that "[t]hen all of a sudden he just showed up and parked in my front yard." The victim left Leland's home that same day. Leland said she assumed the victim returned to Memphis.

. . . .

Sergeant John Goad of the MPD testified that on April 15, 2006, the victim came into the police department and told him that she thought

2

"somebody threw a hammer through her window." He said that she had "marks on her where from the day before she was attacked" and that another officer took photographs of her injuries. Sergeant Goad identified three photographs for the jury. He said that the first photograph showed the victim's chest and that he wrote on the photograph "injuries to a chest area due to a fight that took place on April 14th of 2006." He said that a second picture showed injuries to the victim's arm "where she stated that she was grabbed by the arm." He said that the third picture showed the victim's "backside" where she was scratched by breaking glass and that "I think it was from the back window of her car or something." The victim told Sergeant Goad that her boyfriend was responsible for her injuries.

. . . .

Tracie Price testified that she worked with the victim at Imperial Security. She said that the victim talked about the [Petitioner] "all the time" and that she saw the [Petitioner] drop off the victim at work sometimes. Price said that the victim often put her telephone calls with the [Petitioner] on "loud speaker" and that the [Petitioner] and the victim were always arguing. One day in October 2006, the victim and Price were at work, and the victim got into an argument with the [Petitioner] over the telephone. After the argument, the [Petitioner] walked into the building and created a disturbance. Price explained,

> It was a loud commotion. He was banging on the window telling her bitch, I need to talk to you right now, I need to talk to you. And she was very upset. She was very afraid. She came in, knocked on my boss' door and that's when me and my boss came out and was asking her what was going on. That's when she said her boyfriend was up here and she was afraid to go out to talk to him because he was going to beat her up and she wanted someone to escort him off the premises.

Price testified that the [Petitioner] was angry and that she and her boss had an armed dispatcher escort him out of the building. At some point, the victim was fired. The next day, Price learned from the police that the victim had been shot and killed. Price said the [Petitioner] later telephoned her and "tried to explain to me that it was an accident." Price said that she did not know why the [Petitioner] called her and that she thought his call was unusual. She recorded the call and gave the recording to the police, and the State played the recording for the jury. Price said that two to three months

3

before the shooting, the victim told her that the victim was going to leave the [Petitioner].  Price offered to let the victim stay with her.

. . . .

Charles Woods testified that he worked for Imperial Security as a dispatcher and worked with the victim.  One day, Woods was informed that the [Petitioner] was causing a disturbance.  Woods told the [Petitioner] that the [Petitioner] had to leave, and the [Petitioner] began making threats.  Woods said that he finally got the [Petitioner] outside and that the [Petitioner] continued making threats.  Woods said the [Petitioner] got into his car and "sped off."  Woods described the victim as "[v]ery distraught."

On cross-examination, Woods testified that he thought the incident happened around the first of November 2006.  He said he did not report the incident to the police because the [Petitioner] did not cause any property damage or physically harm anyone.  However, the [Petitioner] was "irate" and was "trying to get into that glass."  Woods said the [Petitioner] could not get into the victim's office because the door was locked.

. . . .

Caroline Farmer testified that in January 2007, she was living in Edgewater Apartments.  The [Petitioner] lived in an apartment "on the opposite side in the back" with his brother and a woman Mrs. Farmer identified as the victim.  On January 13, 2007, a Saturday, Mrs. Farmer and her husband were in and out of their apartment because they were grilling meat for Mrs. Farmer's birthday.  Mrs. Farmer said that sometime between 5:00 and 7:00 p.m., she heard "a lot of banging or beating and then I heard something like kicked, like it might have been a door or something kicked in."  She stated, "I can't tell was it a wall or door but I know it was some beating and I heard a kick."  After the kick, Mrs. Farmer heard one gunshot.  The State asked her how close in time the gunshot occurred to the beating/kicking sound, and she answered, "It was right after that."  She and her husband went outside and saw the [Petitioner]'s brother on a cordless telephone.  Mrs. Farmer said that she saw the [Petitioner] after the police arrived and that he looked "a little upset."

. . . .

4

Eddie Farmer, Caroline Farmer's husband, testified that on the evening of January 13, 2007, he was grilling meat. Between 5:30 p.m. and 6:00 p.m., he went into his bedroom to rest. About ten or fifteen minutes later, Mrs. Farmer woke him and told him that she had heard a gunshot. Mr. Farmer went outside, saw the [Petitioner]'s brother dial 9–1–1 on a cellular telephone, and heard the [Petitioner]'s brother say, "I wish they [would] hurry up." The [Petitioner]'s brother went back into the [Petitioner]'s apartment, and the [Petitioner] came outside, looking for the police or an ambulance. Mr. Farmer said the [Petitioner] was "kind of panicked like."

Retired MPD Officer James Fitzpatrick testified that he responded to the shooting. When he arrived, other officers were already on the scene and had detained two men. The victim was lying on the living room floor directly in front of the apartment door. She was on her back, and her arms were at forty-five-degree angles from her body. She was wearing a shirt, bra, pants, socks, and tennis shoes, and she was frothing at the mouth. The victim had a wound to her upper left chest, and blood was on her chest and face.

Fitzpatrick testified that the apartment had only one exterior door. The door had two locks, a "twist type" lock in the doorknob and a deadbolt lock above the doorknob. Neither lock was functional when Fitzpatrick examined them. He stated that the bolt in the deadbolt lock had been removed and that the faceplate for the lock in the doorknob had been "forced off, kicked in, knocked in or something." The faceplate was on the living room floor near the victim. Fitzpatrick collected the faceplate, a .22-caliber spent shell casing, and a .22-caliber live round from the living room floor. He also collected items from the victim's person and the handgun involved in the shooting.

Fitzpatrick testified that the [Petitioner] waived his Miranda rights and gave a statement. In the statement, the [Petitioner] said that he and the victim did not argue on January 13. That evening, they ate dinner, and the victim went into the bedroom to watch television. Later, the [Petitioner] went into the bedroom to watch television with her. His brother, Chris Martin, was asleep on the living room couch. The [Petitioner] and the victim were "messing around" and were about to have sex when they heard a noise. The [Petitioner] put on his pants, got his .22–caliber semiautomatic handgun from underneath the bed, and followed the victim out of the bedroom. They walked down the hallway and into the living room. The appellant looked down at his gun and noticed that the safety catch was off. He said that the victim "was always leaving the safety off" and that he was showing her how

5

to turn the safety catch on when the gun "went off." The victim did not fall immediately, and the [Petitioner] asked her if she was alright. The victim dropped to her knees and fell over, and the [Petitioner] woke his brother. The [Petitioner] called 911 and applied pressure to the victim's wound. The [Petitioner] told Fitzpatrick that he and the victim had gone into the living room because they heard the door slamming, that they were "just checking to make sure that no one was in the house," and that they were in the living room about twenty seconds before he shot the victim. He stated that he and the victim had taken the deadbolt lock out of the door previously because someone had tried to break into the apartment but that the lock on the doorknob still worked. Fitzpatrick said the [Petitioner] was calm during the interview.

Fitzpatrick testified that parts of the [Petitioner]'s statement were inconsistent with what he observed at the crime scene. For example, Fitzpatrick wondered how the live round got onto the living room floor. He explained that if the live round had been in the chamber of the gun and the appellant had "rack[ed]" the gun to fire it, then the live round would have been ejected. He also noted that the [Petitioner] claimed he and the victim were about to have sex but that the victim was fully clothed. Additionally, Fitzpatrick had asked the [Petitioner] where the victim was injured, and the [Petitioner] had claimed he did not know. However, the [Petitioner] later said that he applied direct pressure to her wound. Fitzpatrick noticed that the [Petitioner] had a fresh, deep bite mark on his shoulder, and the [Petitioner] claimed the bite occurred during sexual foreplay. Fitzpatrick said, "I thought it was rather odd because he never made mention of it. It had to be discovered by us in the office." Fitzpatrick said he did not see any blood on the [Petitioner]'s face or on the front of his clothes but saw "something" near his shirt collar.

. . . .

Jason Hopper testified that on January 13, 2007, he was an MPD officer and responded to a shooting call at the Edgewater Apartments. He and his partner were the first officers on the scene. A young African-American female was lying on the living room floor, and a large amount of blood was on her face and shirt. She had a gunshot wound to her upper chest and began foaming at the mouth. Two African-American males were in the room, and one of them, who was the [Petitioner], told Hopper that he accidentally shot his girlfriend. Hopper saw a live round on the floor, and the [Petitioner]t told Hopper that he fired his gun only one time. Hopper said

6

that based on that statement, "the live round shouldn't have been there." Hopper also saw on the floor a small brass metal plate from the door, a spent shell casing, and a handgun. The [Petitioner] told Hopper that the gun was the weapon involved in the shooting. Later at the Homicide Bureau, Hopper saw a bite mark on the back of the [Petitioner]'s left shoulder and a "hint" of blood on the [Petitioner]'s shirt over the bite mark.

Retired MPD Officer John Pasley, . . . spoke with the [Petitioner], who was being held on a "48-hour hold." After the 48-hour time period expired, Pasley released the [Petitioner] from custody but continued investigating the case. As part of his investigation, Pasley spoke with Shanté Rudd, and she told him about her telephone conversation with the victim on the day of the victim's death. Rudd's information was important because the [Petitioner] had claimed that he and the victim did not have an altercation that day. The [Petitioner] also had claimed that the shooting was accidental, but Pasley learned that the victim and the [Petitioner] had "at best a stormy relationship" and that the relationship had a history of domestic violence. Pasley said the events "didn't seem to match the story he was telling us." Pasley sent the victim's shirt, a firearm, a spent shell casing, and the bullet recovered from the victim to the Tennessee Bureau of Investigation (TBI).

. . . .

Amy R. McMaster, the Davidson County Chief Medical Examiner, testified as an expert in forensic pathology that she prepared the victim's autopsy report. A bullet entered the left side of the victim's chest and traveled front to back, left to right, and slightly downward. The bullet fractured the victim's second left rib; traveled through her left lung and aorta, a major blood vessel; and came to rest in her spine. . . . Dr. McMaster said that the victim's cause of death was a gunshot wound to the torso and that the manner of death was homicide. . . .

The then twenty-nine-year-old [Petitioner] testified that he grew up in Batesville, Mississippi, and met the victim when he was eight years old. They went to school together and dated about three years in high school, but the [Petitioner] never visited her home. In 2000, the [Petitioner] entered the Navy. His specialty was hospital corpsman, and he received emergency medicine training. In 2005, the [Petitioner] was honorably discharged from the military. During a trip the Batesville, he reconnected with the victim, and they began dating. The victim moved in with him in Memphis in August 2005. He said that she was a loving and caring person but that she was blunt

7

and stubborn. He stated that he and the victim argued a lot because he also was stubborn but that they got along "pretty decent" and never fought physically. Both of them used profanity during their arguments.

Regarding the April 15, 2006 incident, the [Petitioner] testified as follows: He and his brother returned to the apartment from the gym about 1:00 p.m. and discovered that the apartment's side window had been shattered. The [Petitioner] asked the victim about the window, and she told him that while he was gone, she had returned to the apartment and been unable to get inside. The victim claimed that she thought the [Petitioner] had the door locked, that she tapped on the apartment's glass window to get his attention, and that the glass shattered. The [Petitioner] removed the lock from the apartment door and took it to the maintenance office. The employees in maintenance told him to report the broken window to the police. The victim overheard the conversation and stated, "[D]on't call the police on me." When the [Petitioner] later returned to the apartment, he discovered that the driver's side window of his car had been broken and that the victim was gone. He telephoned the police and reported the broken car window, and the police told him to stay by his car. The [Petitioner] did not want to press charges against the victim for breaking the windows, but he telephoned James Bownes to talk about the victim. Bownes told the appellant that he was on his way to Memphis. The [Petitioner] met Bownes and Tamu Leland at a gas station, and they followed him back to the apartment. When they arrived, the victim was outside and talking with two police officers. The officers asked the [Petitioner] if he wanted to press charges, and the [Petitioner] said no. The victim left with her family. After five days, she telephoned him and told him that she was ready to come home. The [Petitioner] said that he did not break the car window, that he did not chase the victim with a hammer, and that he did not see any cuts or bruises on her.

Regarding the disturbance at Imperial Security, the [Petitioner] testified as follows: The victim began working at Imperial Security in May 2006, and the [Petitioner] occasionally visited the victim at work in order to exchange cars with her. One day, the [Petitioner] and the victim had "a little argument on the phone." The [Petitioner] drove to Imperial Security to exchange cars with the victim, and she began "fussing" at him for not leaving gas in the car. The victim went into her office, got the car keys, and threw them at the [Petitioner]. He went to the car to leave, but the victim told him to come back and told him to take his "stuff" out of one car and put it in the other car. The [Petitioner] walked into the building to get the car keys from

8

the victim. Charles Woods told him that "we can't have this up here" and walked the [Petitioner] outside. The [Petitioner] said he "might have tapped on the glass a couple of times" but that he was not "beating" on the glass. The [Petitioner] denied threatening Woods and said, "I just told him don't put his hands on me." The [Petitioner] said he did not know that the victim was planning to move out of their apartment or stay with Tracie Price.

The [Petitioner] testified that January 13, 2007, a Saturday, started as a "normal day." He and the victim went to a Sonic Drive-In, then a pet store, and finally the bank. They got home about 4:00 or 5:00 p.m., and the [Petitioner]'s brother was asleep on the couch. After dinner, the [Petitioner] used the computer in his brother's bedroom, and the victim watched television in the master bedroom. The victim was on the telephone, but the [Petitioner] did not know to whom she was speaking. Earlier that day, the [Petitioner] and the victim had a "usual argument," but the [Petitioner] did not remember what it was about. After the [Petitioner] finished using the computer, he went into the bedroom and watched television with the victim. He and the victim were having oral sex when they heard the apartment's front door hit the fireplace. The victim wanted to "check it out," so the [Petitioner] grabbed his gun from underneath the bed. The [Petitioner] opened the bedroom door and saw his dog standing in the hallway, "looking dead at the [front] door." The [Petitioner] and the victim walked in the hallway toward the living room. The [Petitioner] said that no lights were on in the living room, that he "made the weapon ready" by pulling back the slide, and that he noticed the safety catch was off. When he and the victim got into the living room, the [Petitioner] stopped by the telephone while the victim looked out the kitchen window to see if anyone was outside. The front door was wide open, and the [Petitioner] picked up the telephone with his left hand in case he had to call 911. He was holding the pistol in his right hand. As the appellant tried to put on the gun's safety catch, his left hand hit the trigger, and the gun fired. The victim was standing about five feet away, and the [Petitioner] asked if she was okay. The victim did not say anything and dropped to her knees. The appellant dropped the pistol, went to the victim, and called 911. He put pressure on her wound and gave her "rescue breaths."

*Id.* at *1-10.

Following this court's affirmance on appeal, the Petitioner timely filed a post-conviction petition alleging that he had received the ineffective assistance of counsel. In part, he argued that his attorney ("Counsel") had a conflict of interest at the time he represented the Petitioner. He claimed that, while representing the Petitioner, Counsel also

9

represented Sherra Wright who was charged with the murder of Lorenzen Wright, and the Petitioner was a person of interest in the murder of Lorenzen Wright. He also claimed that Counsel was ineffective for failing to call the Petitioner's brother, Christopher Martin, to testify at trial. The post-conviction court held a hearing where the parties presented the following evidence:

Counsel testified that he tried the Petitioner's case two times. The first time, in 2009, the jury acquitted the Petitioner of first degree murder but there was a hung jury on the second degree murder charge. The case was tried again in 2012, and the jury convicted the Petitioner of second degree murder.

Counsel recalled that the Petitioner's position was that the shooting was an accident. He said that the fact that there was only one gunshot wound, that the Petitioner was at the scene when the police arrived, and that the Petitioner or his brother called 911, supported the defense theory that the shooting was an accident. Counsel agreed that the Petitioner's statement to the police right after the shooting also reflected that the shooting was an accident.

Counsel testified that the Petitioner had told him that there had been recent burglaries or break-ins in the apartment complex around the time of the shooting, but Counsel could not recall "the details of it." The Petitioner told Counsel that he and the victim heard a noise and went to check on it. The Petitioner had a gun and was showing the victim how to engage the safety. In the process, the gun accidentally went off and shot the victim in the chest.

When questioned about the Petitioner's brother's, Christopher Martin, role in the incident, Counsel said that Mr. Martin did not have "a role until after the fact." According to Counsel, Mr. Martin was asleep on the couch when the shooting occurred. He did, however, call 911 after the shooting. Counsel agreed that Mr. Martin testified at the 2009 trial. He explained that he did not call Mr. Martin as a witness in the 2012 trial because Mr. Martin felt he did not have anything to add because he had been asleep at the time of the incident. Counsel noted that, because he was asleep, Mr. Martin could not testify about anything leading up to the incident. Further, Counsel was unsure of whether Mr. Martin would be present to testify because he was "out of town some place." Counsel clarified that it was not a situation where Mr. Martin refused to come to court; rather, the discussion ended with a conclusion that it was not necessary for Mr. Martin to appear due to his limited knowledge of what had occurred. Counsel did not recall the Petitioner wanting his brother to testify. Counsel stated that, if the Petitioner had conveyed to him that the Petitioner wanted Mr. Martin to testify, Counsel would have called him to testify.

Counsel recalled that the Petitioner was a witness in the trial of Sherra Wright for the death of Lorenzen Wright. This trial received significant media coverage at the time. Counsel agreed that he represented Sherra Wright for a period of time but stated that his representation of Ms. Wright was after the Petitioner's case. He stated that he did not represent the Petitioner and Ms. Wright at the same time. Counsel denied any knowledge that the police had questioned the Petitioner about the Lorenzen Wright murder during Counsel's representation of the Petitioner. He stated that his discussions with the Petitioner during his representation were solely about the Petitioner's murder charge in this case.

The Petitioner testified about his underlying charge, saying that the gun accidentally discharged when he was "messing with the safety." The Petitioner said that at trial the State argued that he was showing the victim how to engage the safety, but he was not. He said that when he realized the safety was off, he was showing her that the safety was not engaged and telling her it needed to be engaged when stored. As he engaged the safety, the victim approached, and he accidentally pulled the trigger on the gun.

The Petitioner stated that he had wanted the jury to know that the reason he had the gun was because he was concerned someone had broken into his home. About the basis for his concern about a home invasion, he noted that Counsel did not present any evidence of recent burglaries in the area. The Petitioner told Counsel about flyers posted in the area alerting residents of break-ins, but Counsel did not call any witness to testify about the burglaries in the area.

The Petitioner agreed that Mr. Martin's testimony at the 2009 trial was that he was asleep and did not hear an argument or the gunshot. He agreed that Mr. Martin woke up "after the shot." The Petitioner said that Counsel never provided an explanation for why Counsel did not call Mr. Martin to testify in the 2012 trial. The Petitioner asserted that, even though he was asleep, Mr. Martin was an eyewitness and saw the Defendant rendering aid to the victim and observed "the demeanor of what was going on that day."

Between the 2009 and 2012 trials, the Petitioner knew Sherra Wright. At the time, the Petitioner did not know that Counsel represented Sherra Wright. Between his two trials, a detective called the Petitioner and questioned him about the Lorenzen Wright murder. The Petitioner told Counsel about the phone call from the detective. Counsel responded by saying that "he wouldn't represent [the Petitioner] at the - - at a Grand Jury hearing." The Petitioner said that, during the summer of 2010, Counsel "took" him to the grand jury hearing but did not go in with the Petitioner. The Petitioner stated that he learned Counsel was representing Sherra Wright at the same time he was representing the Petitioner when he saw "the reports afterward." He confirmed that he had a copy of "the reports" but he had not brought these documents to the post-conviction hearing.

11

On cross-examination, the Petitioner agreed that he had "not been charged in connection with Lorenzen Wright's murder" during either of his trials. It was after his conviction that he offered the State information about Lorenzen Wright's murder. The Petitioner confirmed that Counsel withdrew from representation before the sentencing hearing in this case. Another attorney represented the Petitioner, and it was during the new attorney's representation, that "negotiations began about [his] cooperation in the Lorenzen Wright case." The new attorney negotiated immunity for the Petitioner's role in Lorenzen Wright's murder in exchange for information.

After hearing this evidence, the trial court denied post-conviction relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal the Petitioner maintains that he received the ineffective assistance of counsel because his attorney had a conflict of interest at the time of his representation of the Petitioner, and Counsel failed to call Christopher Martin as a witness. The State responds that the Petitioner failed to show that Counsel represented Sherra Wright while simultaneously representing the Petitioner. The State also argues that the Petitioner failed to carry his burden of proof with respect to his allegation that Counsel was ineffective for failing to call Mr. Martin to testify at his 2012 trial.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

12

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Conflict of Interest

The Petitioner alleges that Counsel "breached an ethical duty when he undertook representation of Sherra Wright." He argues that Counsel represented Sherra Wright at the same time he represented the Petitioner in this case and the Petitioner was being investigated for Lorenzen Wright's murder. He asserts that this simultaneous representation was "adverse to his representation of the Petitioner." The State responds that the post-conviction court accredited Counsel's testimony that he did not simultaneously represent Sherra Wright and the Petitioner.

The trial court made the following findings about this issue:

We've talked about this at length and I'm still not clear on the timeline. [The Petitioner] kind of tried to clean it up for me a little bit. The lawyers did a terrible job. But you were able to tell me that it was in between the '09 trial and the 2012 trial, that somewhere in there where there was a lull in the development of your case. . . . And at some time - - and it's very murky, either because no one documented it or someone didn't prove it, but it's more likely someone didn't prove it.

And the only person who could tell me that what you alleged didn't happen was [Counsel]: "I did not represent [Sherra Wright] during that time of [the Petitioner's] case." While [Sherra Wright] was being investigated, [Counsel] did not represent you. There was no conflict to disclose.

The evidence does not preponderate against the trial court's finding that Counsel did not represent Sherra Wright and the Petitioner at the same time. The post-conviction court accredited Counsel's statements that he did not represent Sherra Wright at the time he was representing the Petitioner in this case. The Petitioner testified that his negotiations about information related to Lorenzen Wright's murder took place after Counsel had withdrawn and a new attorney was representing the Petitioner. The Petitioner also testified that he had documentation evidencing the conflict of interest; however, he failed to bring the documents with him to the post-conviction hearing. We agree with the post-conviction court that the Petitioner provided very little as to the timeline for Counsel's representation of Sherra Wright and the Petitioner's involvement in the case against Sherra Wright. Accordingly, we conclude that the Petitioner failed to show that there was a conflict of interest in this case. He is not entitled to relief as to this issue.

**B. Failing to Call Christopher Martin as a Witness**

The Petitioner asserts that Counsel willfully "failed to present at the second trial evidence of the resuscitation attempts." Specifically, he asserts that Counsel should have

called Mr. Martin, who lived with the Petitioner, to testify about the parties' relationship and "the events prior to the shooting that day." The Petitioner then recounts in his brief what he believes Mr. Martin "would have" testified to at the 2012 trial.

At the post-conviction hearing, the Petitioner testified that Mr. Martin testified at the 2009 trial and that he had wanted Mr. Martin to testify at the 2012 trial. The post-conviction court determined that the Petitioner's failure to produce this witness at the post-conviction hearing prohibited the post-conviction court from determining whether Mr. Martin's testimony would have been admissible at trial and, in addition, whether that testimony would have materially aided the Petitioner's defense. *See Black v. State*, 794 S.W.2d 753, 757 (Tenn. Crim. App. 1990). We agree.

It is well-settled that a post-conviction petitioner making a claim regarding the failure to call a witness bears a duty to present the witness at the post-conviction hearing in order to enable this court to determine whether his or her testimony might have altered the results of the trial. *Id.* Because the Petitioner failed to produce the witness at the post-conviction hearing, he is not entitled to relief based on a claim that the failure to call the witness at trial amounted to ineffective assistance of counsel.

To the extent the Petitioner appears to argue that Counsel failed to present a self-defense claim, we deem that issue waived because the Petitioner failed to raise this issue in his petition and failed to present testimony on the issue at the post-conviction hearing. "Issues not addressed in the post-conviction court will generally not be addressed on appeal." *Walsh v. State*, 166 S.W.3d 641, 645 (Tenn. 2005) (citing *Rickman v. State*, 972 S.W.2d 687, 691 (Tenn. Crim. App. 1997); *State v. White*, 635 S.W.2d 396, 397-98 (Tenn. Crim. App. 1982)). Moreover, "an issue raised for the first time on appeal is waived." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) (citing *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996)). Because the record shows that the Petitioner failed to raise this issue in the post-conviction court, the Petitioner has waived this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____*s/ ROBERT W. WEDEMEYER*__
ROBERT W. WEDEMEYER, JUDGE